1
2
3
4                     UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    R.C.,[1]                                  Case No.  18-cv-05104-JCS

8                  Plaintiff,
                                              **ORDER REGARDING MOTIONS FOR**
9           v.                                **SUMMARY JUDGMENT**

10   NANCY BERRYHILL,                         Re: Dkt. Nos. 17, 20

11                 Defendant.

## I.      INTRODUCTION

Plaintiff R.C. ("R.C." or "Plaintiff") brought this action seeking judicial review of the final

decision of Defendant Nancy Berryhill, Commissioner of Social Security (the "Commissioner" or

"Defendant"), denying R.C.'s application for Title II, Social Security Disability Insurance

("SSDI") disability benefits and Title XVI, Supplemental Security Income ("SSI") disability

benefits.  R.C. argues that the administrative law judge ("ALJ") improperly rejected medical

evidence and R.C.'s testimony.  The parties have filed cross motions for summary judgment

pursuant to Civil Local Rule 16-5.  For the reasons stated below, R.C.'s motion is GRANTED, the

Commissioner's motion is DENIED, and the case is REMANDED for further administrative

proceedings in accordance with this order.[2]

---

[1] Because opinions by the Court are more widely available than other filings, and this order
contains potentially sensitive medical information, this order refers to the plaintiff only by his
initials. This order does not alter the degree of public access to other filings in this action provided
by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all
purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

## II.    BACKGROUND

### A.    R.C.'s Background

#### 1.    Personal History

R.C. was born in August 1958.  Administrative Record ("AR," dkt. 12) at 174.  R.C. alleges that his disability began on June 15, 2013 based on degenerative disc disease of cervical spine.[3]  Id. at 174, 198.  R.C.'s date of last insured for Title II benefits was March 31, 2014.  Id. at 188, 194.  His highest grade of school completed is the 12th grade.  Id. at 199.  He worked as a household mover from 1993 to 2009, when he was laid off.  Id. at 198, 199.  In 2013, R.C. admits to having worked part time as a cleaner for two months.  Id. at 38-39.  In 2014, R.C. worked part-time as a mover for three months until he was involved in an auto accident June 2014.  Id. at 35-37, 40.

#### 2.    Medical Records

On August 5, 2012, R.C. had x-rays of his cervical spine taken that showed mild to moderate degenerative disk changes and mild degenerative facet changes.  AR at 385.

On October 30, 2012, R.C. went to the emergency room with complaints of lower back pain.  Id. at 307.  He said that he had experienced lower back pain for the last year, but this pain was worse than baseline.  Id.  R.C. stated that he was a household mover.  Id.  During the physical examination, the doctor noted normal range of motion and normal muscle tone.  Id. at 308.  The doctor further noted that R.C. had no neurological deficit.  Id.  The doctor diagnosed the back pain as likely a musculoskeletal spasm.  Id. at 309.  R.C. was told to start taking Flexeril for muscle spasms and Motrin for pain.  Id. at 337.

On September 30, 2013, R.C. went to the emergency room and complained of headaches and some neck pain.  Id. at 360.  However, the medical records reflect that R.C. later denied neck pain.  Id. at 361.  R.C. denied having any back pain.  Id. at 362.  During the physical examination, the doctor noted normal range of motion.  Id.

---

[3] In the disability report, R.C. indicated that "[i]n 6/2013, i was in a vehicle accident and have been unable to look for work since."  AR at 198.  He stated that he believed his conditions became severe enough to keep him from working on June 15, 2013.  Id.  As discussed later in this opinion, it appears R.C. was involved in the vehicle accident in 2014 not 2013.  Id. at 369

2

1    On October 25, 2013, R.C. saw a doctor because of head pain and wanted a CT scan.  Id. at

2    405.  The active problem list contained in the medical records included lumbago, sciatic, and

3    cervicalgia.  Id.  The doctor ordered R.C. to take Naprosyn, an anti-inflammatory drug.  Id. at 406.

4    On November 7, 2013, R.C. had a CT head scan that found mild bilateral ethmoid sinus disease.

5    Id. at 386

6    On February 24, 2014, R.C. was seen at the emergency room for chest pain, shortness of

7    breath, and abdominal pain.  Id. at 363.  R.C. denied having any neck or back pain.  Id. at 365.

8    During the physical examination, the doctor noted normal range of motion.  Id. at 365-366.  R.C.

9    received chest x-rays.  Id. at 387.

10   On July 08, 2014, R.C. went to the hospital and complained about headaches and neck

11   pain.  Id. at 369.  He stated that he was involved in a car accident three weeks prior.  Id.  R.C.

12   "was sleeping in his big rig truck and was hit by a car, caught himself, did not fall to the ground,

13   did not LOC" and was seen at that time.[4]  Id.  According to the medical records, R.C. felt that his

14   headaches and neck pains were worse since the accident.  Id.  The medical records reflect diffuse

15   neck and back pains but no numbness or weakness.  Id.  Upon examination, R.C. had mild

16   discomfort on range of motion of the neck and tenderness to palpation.  Id. at 370.  However, R.C.

17   exhibited normal gait, intact motor and sensory examination, normal coordination, and normal

18   muscle tone.  Id. at 370-371.  R.C. had another CT head scan that showed: "1. No accurate

19   intracranial hemorrhage or mass effect. 2. Sinus disease."  Id. at 387-388.

20   On July 22, 2014, R.C. saw a physician and complained of persistent neck and lower back

21   pain after his car accident.  Id. at 407.  R.C. was "requesting 3 more weeks off."  Id.  Upon

22   physical examination, the doctor found that R.C. had full range of motion but noted that R.C. was

23   symptomatic for Lumbago and mildly symptomatic for Cervicalgia.  Id. at 408.  In R.C.'s

24   assessment plan, the doctor noted that R.C. should take Flexeril, Naprosyn, and Norco.  Id. a 408-

25   409.

26   On October 6, 2014, R.C. was again treated for neck pain and lower back pain.  Id. at 410.

27

28   _____

[4] Although the doctor notes that R.C. was seen at the time of the car accident, the administrative record does not contain any medical records from that time period.

The doctor noted that R.C. had been seen at the ER "last week" and was given 20 tablets of Norco. Id. R.C. was symptomatic for lumbago and cervicalgia. Id. at 411. However, R.C. had no costovertebral angle tenderness and negative straight leg raising test. Id. The doctor discontinued Norco and prescribed Tylenol #3 instead. Id. R.C. also continued Lioresal (treating muscle spasms) and Naprosyn (anti-inflammatory drug). Id. at 411-412.

On November 13, 2014, R.C. was treated for intermittent headaches and associated tingling down his left arm. Id. at 371. The medical records noted that the pain "radiates to the left neck and left shoulder, worse with certain movements, improved with 'pulling on the head.'" Id. at 373. The medical records also note that R.C. reported "tingling to the top of the shoulder to the mid humerus." Id. However, R.C. denied weakness and stated that it did not spread to his hand. Id. During the review of systems, the doctor noted that R.C. was positive for back pain. Id. at 374. However, the doctor noted that R.C. was negative for neck pain and neck stiffness. Id. Upon physical examination, the doctor noted that R.C. had normal range of motion. Id. at 374-75.

On December 11, 2014, R.C. went to the doctor with complaints of neck pain. Id. at 412. However, R.C. requested a note to be able to go back to work without any restrictions.[5] Id. Upon physical examination, the doctor noted that R.C. had full range of motion. Id. at 413. The doctor noted that R.C. was asymptomatic for lumbago but symptomatic for cervicalgia. Id. at 413-414.

On February 6, 2015, R.C. was seen at the emergency department for neck pain. Id. at 475. On February 10, 2015, R.C. went to the doctor complaining of neck pain. Id. at 415. The medical records note that R.C.'s chronic pain was slowly progressive over several years and pain was always present. Id. R.C.'s pain was variable in intensity with some radiation down upper arms to just above elbows. Id. The pain did not affect R.C.'s strength in his hands. Id. Dr. Burns examined R.C. and noted that R.C. sat stiffly and kept his head still. Id. at 415. Dr. Burns also noted increase tone in R.C.'s neck in all directions and a reduced range of motion. Id. Dr. Burns gave R.C. a Toradol injection for neck pain and continued him on Naprosyn and Norco. Id. at 416. Dr. Burns ordered an abdomen x-ray that showed "[f]airly prominent degenerative changes

_____

[5] It is unclear where R.C. was working at the time because, at the administrative hearing, R.C. testified that he had not worked since June 2014, after the car accident. AR at 35-37, 40.

United States District Court
Northern District of California

involving the spine with spurring and sclerosis." Id. at 429.

On February 18, 2015, R.C. saw Dr. Burns for a follow up appointment. Id. at 417. The medical records indicate that R.C. had neck pain occasionally radiating into his left upper extremity with numbness in the fingers of his left hand. Id. R.C. also had sciatica on his left side with radiation into is leg. Id. The records also note that R.C. had right knee pain. Id. R.C. told the doctor that the medications did not help much. Id. Dr. Burns prescribed Flexeril for muscle spasms. Id. at 418. Dr. Burns referred R.C. to physical therapy. Id.

On March 4, 2015, Dr. Burns treated R.C. for flank pain and neck pain. Id. at 419. The medical records reflect that the medications were helping some. Id.

An MRI performed on March 15, 2015 indicated minimal posterior disc-osteophyte complex a C2-3, moderate right central disc protrusion and narrowing of the subarachnoid space without cord compression at C4-5, and moderate left central disc protrusion and moderate left neural foraminal stenosis at C6-7. Id. at 471.

On March 25, 2015, R.C. saw Dr. Burns for back and neck pain. Id. at 437. R.C. also complained of left hip pain that radiates into his lateral thigh. Id. R.C. said that medications help a little and Toradol injections helped for a couple of days. Id. Upon physical examination, Dr. Burns noted that R.C. did not have focal spams in his back. Id. at 438. However, R.C.'s back was tender, and he was unable to flex or extend due to pain. Id. Dr. Burns administered another Toradol injection. Id. R.C. started Gabapentin for nerve pain. Id. at 439. An x-ray of R.C.'s left hip showed mild joint space narrowing, consistent with degenerative joint disease. Id. at 448.

On April 7, 2015, R.C. saw Dr. Burns and told him that he was still having lots of neck pain, low back pain, and bilateral hip pain. Id. at 439. R.C. said that his pain is worse when walking. Id. R.C. also reported "intermittent LLQ cramping, brief and sharp, worse with bending at waist." Id. Tylenol was not helping but norco was somewhat effective. Id. R.C. was asking for light duty at work.[6] Id. Dr. Burns increased R.C.'s dose of Gabapentin and added Ultram for pain. Id. at 440-441. Dr. Burns diagnosed R.C. with osteoarthritis. Id. at 441.

---

[6] Again, it is unclear where R.C. was working at the time because, at the administrative hearing, R.C. testified that he had not worked since June 2014, after the car accident. AR at 35-37, 40.

5

1        On April 24, 2015, R.C. began physical therapy for his neck.  Id. at 456.  R.C. complained

2   of "[n]eck pain and UT (R more than L) pain and in arms."  Id.  R.C. stated his neck pain began a

3   year and a half ago.  Id.  R.C. reported bilateral hand numbness and tingling.  Id. at 457.  He

4   reported difficulty turning his neck, reaching and lifting, and sleeping at night.  Id.  The physical

5   therapist observed "[d]ecreased muscle length noted in: Pectoralis Minor:B and Pectoralis

6   Major:B."  Id. at 459.  The physical therapist also noted, "[m]ild difficulty with overhead reaching

7   and mod difficulty with back hand reaching with RUE."  Id. at 459.  According to the outpatient

8   physical therapy improvement in movement assessment log, R.C. had moderate difficulty walking

9   long distances and reaching.  Id. at 460.  R.C. also had much difficulty lifting 20 pounds.  Id.  The

10  physical therapist assessed physical impairments including range of motion limitations and pain.

11  Id. The physical therapist also found functional limitations including "function endurance, position

12  and household activities reaching and lifting."  Id.  The medical records indicate that R.C.

13  "[p]resents with signs/symptoms consistent with neck pain with h/o disc protrusion."  Id.

14       On May 6, 2015, Dr. Burns noted that R.C.'s neck pain persisted, and R.C. wanted to see

15  neurosurgery to discuss further options for pain relief.  Id.  at 441.  R.C. stated that Gabapentin has

16  been helping.  Id.  Dr. Burns diagnosed R.C. with cervical spondylosis.  Id. at 442.  On May 31,

17  2015, R.C. complained of leg pain and right hip pain that was worse with weigh-bearing.  Id. at

18  443.  R.C. stated that the medications were not helping.  Id.  On July 1, 2015, Dr. Burns noted that

19  R.C. had less pain in his right hip.  Id. at 445.

20       On July 2, 2015, the fifth session (out of the six recommended sessions), the physical

21  therapist found that R.C. had met all his goals.  Id. at 470.  The therapist noted that R.C. was able

22  to turn his neck with increase range of motion of 65 degrees and had had 50% decreased neck

23  pain.  Id.  In addition, R.C. was able to sleep through the night without waking up from neck pain.

24  Id.  R.C. still reported that he could not do lifting, which brought pain back.  Id. at 469.  R.C. was

25  discharged early.  Id. at 470.

26       On July 21, 2015, Dr. Burns filled out a work/school note for R.C., indicating that R.C. "is

27  being evaluated & rated for chronic neck and low back pain with sciatica; imaging studies suggest

28

United States District Court
Northern District of California

1    moderate disc disease of the spine, non-surgical at this time." [7]  Id. at 476.

2           On August 19, 2015, Dr. Burns examined R.C. who was complaining that he had washed

3    his car over the weekend and awoke the next day with a stiff and sore neck.  Id. at 549.  R.C.

4    denied radiation into his arms or hand.  Id.  Dr. Burns noted that R.C.'s neck had "ROM about

5    25% to R, 75% to L, flexion 90%, extension 50%."  Id. at 549.  Dr. Burns further noted that R.C.'s

6    neck was "[f]ocally tender over R upper trap with trigger point present and increase overall tone."

7    Id.  R.C. was given an injection and refills of his medications.  Id. at 549-550.

8           On September 8, 2015, Dr. Burns filled out a statement.  Id. at 544.  In the statement, Dr.

9    Burns opined that R.C. suffered from chronic lower back pain and neck pain with spondylosis.  Id.

10   The doctor listed R.C.'s prognosis as "fair."  Id.  Dr. Burns indicated that R.C.'s impairments

11   lasted or were expected to last at least twelve months.  Id.  The doctor indicated R.C. suffered

12   from depression, loss of interest in activities, decreased energy, and sleep disturbances, which

13   affected R.C.'s physical symptoms.  Id. at 545.  Dr. Burns opined that R.C.'s pain or other

14   symptoms were severe enough to occasionally interfere with his attention and concentration. [8]  Id.

15   The doctor also opined that R.C. could walk four blocks without rest or severe pain, could sit for

16   two hours at one time, and could stand for two hours at one time.  Id.  Dr. Burns indicated that

17   R.C. would be able to sit a total of two hours in an 8-hour workday, stand a total of two hours, and

18   walk a total of two hours.  Id.  Dr. Burns also opined that R.C. would need periods of walking

19   around during an 8-hour workday and would need to walk for 10 minutes every hour.  Id.  Dr.

20   Burns opined that R.C. would need a job that permits shifting positions at will because of pain.  Id.

21   at 546.  However, he did not believe R.C. would need to take unscheduled breaks or need to keep

22   his legs elevated.  Id.  Dr. Burns believed R.C. could lift 10 pounds frequently, 20 pounds

23   occasionally, and 50 pounds rarely.  Id.  Dr. Burns believed R.C. could rarely look down and

24   occasionally turn head right or left, look up, or hold head in static position.[9]  Id.  Dr. Burns opined

25   _____

26   [7] It is unclear why Dr. Burns wrote this work/school note because, at the administrative hearing,
     R.C. testified that he had not worked since June 2014 after the car accident.  AR at 35-37, 40.
27   [8] "Occasionally" is defined as 6% to 33% of an 8-hour working day.  AR at 545.
     [9] "Rarely" is defined as 1% to 5% of an 8-hour working day, "occasionally" is defined as 6% to
28   33% of an 8-hour working day, and "frequently" is defined as 34% to 66% of an 8-hour working
     day.  AR at 545.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    that R.C. could occasionally twist, rarely stoop, crouch/squat, or climb stairs, and never climb

2    ladders. Id. at 547. However, R.C. did not have significant limitations with reaching, handling, or

3    fingering. Id. Dr. Burns opined that R.C. would likely have "good days" and "bad days" and

4    would likely be absent from work about three days per month. Id. Dr. Burns opined that the

5    limitation identified first began on February 24, 2014. Id.

6          On October 21, 2015, R.C. was treated for neck pain and reported that he was experiencing

7    more spasms. Id. at 551. R.C. said that some of the medication helped. Id. Dr. Burns noted,

8    "increased tone in upper trapezius muscles, flexion full, extension and B rotation about 50%

9    normal." Id. at 551. Dr. Burns increased Gabapentin. Id. at 552. On November 20, 2015, R.C.

10   was again seen for neck pain. Id. at 553. On December 21, 2015, R.C. experienced neck pain and

11   numbness. Id. at 554. He wanted to continued physical therapy. Id. On February 1, 2016, R.C.

12   reported that the medications were helping but told Dr. Burns that he wanted to try physical

13   therapy and pool therapy. Id. at 556. On March 9, 2016, R.C. reported that his neck pain is stable

14   but he experienced intermittent lower left quadrant cramping. Id. at 558. However, on April 27,

15   2016, R.C. reported that he was still having neck pain and stiffness. Id. at 561. R.C. stated that

16   some good days and not so good days but he reported pain medications helped. Id. at 561-562.

17         R.C.'s lumbar spine x-ray dated September 6, 2016 indicated that R.C. had degenerative

18   changes in the lower lumbar spine with facet arthropathy, notably at C3-C4 and C4-C5. Id. at 586.

19   However, there was no acute compression deformities and no evidence of spondylolysis or

20   spondylolisthesis. Id. On September 14, 2016, R.C. went to the doctor to receive more pain

21   medication and requested a "stronger agent." Id. at 566. The medical records indicated that R.C.

22   was positive for back pain but negative for neck pain and neck stiffness. Id. Dr. Burns indicated

23   that R.C. had normal range of motion in his neck and back. Id. at 566-567. Dr. Burns noted

24   "[t]enderness to palpation and spasticity of the lumbar paraspinal musculature." Id. at 567.

25   However, R.C. had no weakness in the lower extremities bilaterally, normal range of motion in the

26   neck, had negative straight leg raising test, had normal sensation, had normal strength and range of

27   motion in the lower extremities, and a normal neurological exam. Id. at 566-567. Dr. Burns

28   recommended R.C. treat with ice and rest. Id.

United States District Court
Northern District of California

1    Although they did not examine R.C., state agency medical consultants E. Trias, M.D., and

2    A. Volterra, M.D., reviewed the medical evidence and provided opinions on April 10, 2015, and

3    July 16, 2015, respectively.  Id. at 21, 64-71, 72-81, 82-91, 92-105.  Dr. Trias opined that R.C.'s

4    statements regarding intensity, persistence, and functionally limiting effects of the symptoms were

5    not substantiated by the objective medical evidence and R.C.'s statements were only partially

6    credible.  Id. at 68.  Dr. Trias opined that R.C. could occasionally lift 50 pounds and frequently lift

7    25 pounds.  Id. at 69.  In addition, Dr. Trias opined that R.C. could stand about 6 hours in an 8-

8    hour workday and sit about 6 hours in an 8-hour workday.  Id.  Dr. Trias found that R.C. could

9    perform medium exertional work.  Id. at 70, 78.  Dr. Volterra opined that "[e]vidence in the

10   current file for the period from AOD to DLI regarding the clmt's physical musculoskeletal

11   allegations supports physically non-severe."  Id. at 98.  Dr. Volterra opined limitations of climbing

12   ramps and stairs frequently and ropes, ladders, and scaffolds occasionally; frequent stooping,

13   crouching, and crawling; and limited overhead reaching bilaterally.  Id. at 21, 88-90, 99-101.  In

14   the Dr. Volterra recommended, "IE for T2 and a L RFC with occ OH reach for T16. . . [R.C.'s]

15   more recent L hip imaging and neck pain would limit him to a LRFC."  Id. at 86, 97.  In

16   discussing his DIB claim, Dr. Volterra stated, "CLMT IS FOUND CREDIBLE TO

17   ALLEGATIONS BUT NOT FOR T2 TIME PERIOD SHOWS HX OF BACK PAIN AND IS

18   OVERALL NON-SEVERE."  Id. at 88.  However, he later found that the "preponderance of

19   overall evidence supports a medium RFC with postural and manipulative limitations" for both

20   R.C.'s Title II and Title XVI claim.  Id. at 87, 98.  Both doctors found that R.C. could perform

21   medium exertional work.  Id. at 70, 78, 91, 102.

22        **B.    Initial Denial of Application**

23        On February 2, 2015, R.C. applied for a period of disability and disability insurance

24   benefits.  Administrative Record ("AR," dkt. 12) at 180.  R.C. also applied for Social Security and

25   Supplemental Security Income disability benefits on February 2, 2015.[10]  Id. at 174.  In both

26   _____

27   [10] The ALJ's decision states that R.C. applied for a period of disability and disability insurance
     benefits as well as social security income on "December 22, 2014."  AR at 13.  In addition, R.C.'s
28   motion lists the date of his application as February 21, 2015 even though applications cited are
     dated February 2, 2015.  Pl.'s Mot. at 2.  This discrepancy is not material to the outcome of the

1     applications, R.C. alleged that his disability began on June 15, 2013.  Id. at 174, 180.  The

2     Commissioner denied both applications on April 10, 2015.  Id. at 106-110.  The Commissioner

3     noted that R.C.'s said that he was unable to work because of back, neck, and knee injury but found

4     that R.C. should have been able to and currently should be able to perform work that is less

5     demanding than his past occupation.  Id.  Thus, the Commissioner determined that disability was

6     not established on or before March 31, 2014 and currently.  Id.  The Commissioner also denied

7     R.C.'s request for reconsideration on July 16, 2015.  Id. at 113-122.  As to R.C.'s request for

8     reconsideration for Social Security disability benefits, the Commissioner noted that "[t]he medical

9     evidence shows as of 03/31/2014, the date [R.C.] was last insured for disability benefits, [R.C.]

10    did not have a severe impairment that prevented work activity."  Id. at 113.  As to R.C.'s request

11    for reconsideration for Supplemental Security Income payments, the Commissioner found that,

12    "[t]he medical evidence shows that although [R.C. does] have discomfort, [R.C. is] still able to

13    move about and to use [his] arm, hands and leg in a satisfactory manner.  The records show no

14    indication of loss of control or muscle wasting in [his] arms or legs due to nerve damage as a

15    result of [his] back and neck condition."  Id. at 118.

16          **C.     Administrative Hearing**

17                R.C. requested a hearing before an ALJ and a hearing was held on October 24, 2016.  Id. at

18    29-63.  At the hearing, the ALJ asked R.C. questions regarding his employment history.  Id. at 35-

19    41.  In 2009, R.C. worked as a mover for a moving company.  Id. at 40.  For two months in 2013

20    R.C. did cleaning jobs for his cousin for about three to four hours a day, three days a week.  Id. at

21    38.  R.C. would clean the floors and restrooms at a bank.  Id.  at 38-39.  +R.C. stated that from

22    April to June 2014 he worked as a part-time household mover for approximately 25 hours a week.

23    Id. at 35, 37.  R.C. said that the items he was carrying were "[v]ery heavy" and sometimes "about

24    100 pounds."  Id. at 37.  R.C. noted that he moved not only boxes but also "dressers, refrigerators,

25    everything."  Id. at 37.  R.C. stated that he stopped working because he was in an automobile

26    accident in June 2014.  Id.

27

28    _____

      present motion.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

As for his medical condition, R.C. testified that the automobile accident re-injured his neck and back and made those injuries worse.  Id. at 40.  R.C. stated that he previously treated his neck pain with physical therapy and continued to do exercises.  Id. at 41-42.  When asked if R.C. had any limitations on how far he could move his arms R.C. stated he "could go all the way up."  Id. at 43.  However, he stated that he "can move them but it would be a lot of pain with it."  Id.  R.C. testified that he has pain in his shoulder that goes down to his hands.  Id. at 55.  He stated that as a result of his neck pain, he has trouble with his hands.  Id.  He also stated that he would get cramps in his fingers and cannot bend them sometimes.  Id. at 45.  Sometimes R.C. is unable to close his hand.  Id. at 55.  R.C. estimated that this happens every other day and stated that it occurs in both hands.  Id.  R.C. said that he treated his back pain with physical therapy but that the doctors have not talked to him about surgery.  Id. at 44.  R.C. also stated that he experiences pain in his kneecap when he stands and would get pain down his leg.  Id. at 45.  R.C. stated that he experiences sciatica in his right leg may once or twice a week.  Id. at 54.  When he is experiencing sciatica, he is unable to get out of bed and stays in bed all day.  Id.  When asked if he had any other conditions that he believed prevented him from being able to work, R.C. also stated that he started experiencing vertigo a couple of months ago.  Id. at 44.

R.C. stated that he is not able to help out with household chores like sweeping, mopping, or doing the dishes.  Id. at 46.  R.C. testified that he is not able to vacuum at all because it is bad for his neck and back.  Id.  R.C. stated that he is unable cook and relies on his sister and girlfriend to make his meals.  Id.  R.C. stated that he is unable to do dishes because it is too much standing.  Id.  at 46-47.  R.C. testified that he is unable to do yard work and relies on his brother-in-law.  Id. at 47.  R.C. also cannot go to the grocery store and his sister goes grocery shopping and his sister or brother-in-law carries the groceries from the car to the house.  Id.  R.C. testified that he does not do any lifting at all.  Id. at 51.  He is able to lift eight or nine pounds but it is a strain on his neck and back.  Id.  R.C. can make his bed every day.  Id. at 46.  R.C. is also able to do a little dusting.  Id. at 51.  R.C. states that he used to do everything around the house but then the doctor told him he could not do it.  Id.  at 52.  R.C. has a driver's license and sometimes drives to his doctor's appointments.  Id. at 47.  When he does not drive, his girlfriend drives him.  Id.  R.C. estimated

1   that he drives to his doctor's appointments about three times a year.  Id. at 48.

2       R.C. testified that he would not be able to do a job where he would be required to lift 50

3   pounds because he would have too much back and neck pain.  Id. at 52.  R.C. testified that he can

4   sit for about an hour and a half before he needs to change position.  Id.  at 48.  He further stated

5   that he can stand for about two hours before he needs to change positions.  Id.  The ALJ asked

6   R.C. why he could not do dishes if he was able to stand for two hours and R.C. responded,

7   "[m]oving around the kitchen, it's — I thought you were talking about just straight standing."  Id.

8   at 49.  R.C. stated that his leg pain compels him to sit down after standing for about two hours.  Id.

9   R.C. estimated that he would need to take an hour or an hour and 15 minutes break before

10  standing again because that is how long it would take for his leg to stop hurting.  Id.  at 52.

11      On a typical day, R.C. testified that he would get up in the morning and take a shower.  Id.

12  at 49.  R.C. recently started using a stool in the shower because he gets dizzy and does not want to

13  fall.  Id. at 55-56.  R.C. would also take his dog on a walk.  Id. at 49.  R.C. stated that his dog

14  walks are around 30 minutes and spans about one block.  Id. at 50.  R.C. does not need to use a

15  cane or a walker.  Id.  R.C. stated that on the walks he will stop five or six times to let the dog

16  smell the bushes.  Id. at 53.  R.C. also stated that he did not need to sit down or lay down after the

17  walk because "[i]t's only a 30-minute walk."  Id.  R.C. will also ride around in the car with his

18  girlfriend and testified that he can sit in the car for approximately an hour and a half.  Id. at 50.

19  R.C. testified that he had trouble sleeping at night because of neck pain and that he has to take an

20  hour and a half to two-hour nap once a day.  Id. at 56.  R.C. goes to church weekly.  Id. at 51.

21      Thomas Linville, a vocational expert, also testified at the administrative hearing.  The ALJ

22  asked Linville the following hypothetical:

23          [P]lease assume a hypothetical individual the same age, educational
            background and professional experience as the claimant.  Please
24          assume that this hypothetical individual is subject to the following
            limitations.  The exertional level of medium with the use of ramps
25          and stairs limited to no more than frequent; the use of ropes,
            scaffolds, and ladders at no more than occasional; and that stooping,
26          kneeling, crouching, crawling are all no more than frequent.  Given
            these limitations, could such a hypothetical individual perform any
27          of the past work as claimant?

28

United States District Court
Northern District of California

12

1   Id. at 58-59.  Based on that hypothetical, Linville opined that the person described could not do

2   R.C.'s past work.  Id. at 59.  Linville opined that looking at medium unskilled work, the person

3   described could work as an "industrial cleaner," "kitchen helper," or "salvage laborer."  Id. at 59.

4   Linville opined that nothing about R.C.'s past work would transfer down to medium.  Id. at 60.

5          R.C.'s attorney asked Linville the following hypothetical:

6              [I]n addition to hypothetical number one, if a person needed to take
               a rest break for about an hour after two hours of standing or walking,
7              so a rest break for an hour after each of two hour settings of standing
               or walking, would that be tolerated in a work environment?
8

9   Id. at 60.  Linville responded that such limitation reduced the eight-hour day substantially and

10  would probably create a situation where a person is not going to be suitably involved or suitable

11  productive to sustain work.  Id.  R.C.'s attorney asked Linville a second hypothetical:

12             [I]n addition[] to hypothetical number one, if we kept the medium;
               the standing and walking for six hours, sitting for six hours; and the
13             lifting requirements by we changed. . . if we have inability to look
               down in a sustained – with the sustained function of the neck in a
14             looking down position, we'll limit that to rarely; turning the head
               left or right, looking up, or holding a head in any static position to
15             occasionally.  Additionally, for postural limitations we would have
               a limitation to occasional twisting with rarely stooping, rarely
16             crouching and squatting, no ladders, and rarely climbing stairs, how
               does that affect the medium unskilled occupational jobs that are
17             available?
18

19  Id. at 60-61.  Linville responded that this hypothetical would eliminate most of the medium jobs

20  that are unskilled.  Id. at 61.

21          **D.      Legal Background for Determination of Disability**

22          To qualify for Title II benefits, the claimant must prove disability prior to the last insured

23  date.  42 U.S.C. 423(a)(1)(A); Morgan v. Sullivan, 945 F.2d 1079, 1080 (9thCir. 1991).  Title XVI

24  benefits are available to persons who are disabled and meet certain income thresholds.  20 C.F.R.

25  § 416.202.  When a claimant alleges a disability and applies to receive Social Security benefits,

26  the ALJ evaluates the claim using a sequential five step process.  20 C.F.R. § 404.1520(a)(4).  At

27  step one, the ALJ determines whether the applicant is engaged in "substantial gainful activity."  20

28  C.F.R. § 404.1520(a)(4)(I).  Substantial gainful activity is "work activity that involves doing

United States District Court
Northern District of California

1    significant physical or mental activities . . . that the claimant does for pay or profit." 20 C.F.R. §

2    220.141(a)–(b).  If the claimant is engaging in such activities, the claimant is not disabled; if not,

3    the evaluation continues at step two.

4         At step two, the ALJ considers whether the claimant has a severe and medically

5    determinable impairment.  Impairments are severe when "there is more than a minimal limitation

6    in [the claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant

7    does not suffer from a severe impairment, she is not disabled; if she does have a severe

8    impairment, the ALJ proceeds to step three.

9         At step three, the ALJ turns to the Social Security Administration's listing of severe

10   impairments (the "Listing").  See 20 C.F.R. § 404, subpt. P, app. 1.  If the claimant's alleged

11   impairment meets one of the entries in the Listing, the claimant is disabled.  If not, the ALJ moves

12   to step four.

13        At step four, the ALJ assesses the claimant's residual functional capacity, or RFC, to

14   assess whether the claimant could perform her past relevant work.  20 C.F.R. § 404.1520(a)(1).

15   The RFC is a determination of "the most [the claimant] can do despite [the claimant's]

16   limitations." 20 C.F.R. § 404.1520(a)(1).  The ALJ considers past relevant work to be "work that

17   [the claimant] has done within the past fifteen years, that was substantial gainful activity, and that

18   lasted long enough for [the claimant] to learn how do it." 20 C.F.R. § 404.11560(b)(1).  If the

19   claimant is able to perform past relevant work, she is not disabled; if she is not able to perform

20   such past relevant work, the ALJ continues to step five.  In the case of claimants who are fifty-five

21   or older, are restricted to sedentary work, have no transferable skills, and have not completed any

22   relevant vocational education, the Commissioner will usually not offer any evidence of work

23   meeting the claimant's RFC and the ALJ will decide disability based on the claimant's ability to

24   perform past work. 20 C.F.R. § 404, subpt. P, app. 2 § 201.00(d).

25        At the fifth and final step, the burden shifts from the claimant to prove disability to the

26   Commissioner to "identify specific jobs existing in substantial numbers in the national economy

27   that the claimant can perform despite her identified limitations."  Meanel v. Apfel, 172 F.3d 1111,

28   1114 (9th Cir. 1999) (citing Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the

United States District Court
Northern District of California

1   Commissioner is able to identify such work, then the claimant is not disabled; if not, the claimant

2   is disabled and entitled to benefits. 20 C.F.R. § 404.1520(g)(1).

3       **E.      The ALJ's Decision**

4       On February 17, 2017, the ALJ issued an order finding that R.C. was not disabled.  Id. at

5   10-24.  The ALJ determined that R.C. met the insured status requirements of the Social Security

6   Act through March 31, 2014.  AR at 15.  The ALJ found that R.C. had not engaged in substantial

7   gainful activity since June 15, 2013, the alleged onset date.  Id.  Although R.C. worked after the

8   alleged disability onset date, the ALJ determined that this work did not raise to the level of

9   substantial gainful activity.  Id.  This was because, while R.C.'s testified that his earnings were at

10  or near substantial gainful activity level in 2014, given the lack of an earnings record, the ALJ

11  found that it was difficult to state definitively.  Id.  The ALJ found that R.C.'s disc protrusion in

12  the cervical spine was a severe impairment.  Id. at 16.  The ALJ also determined that R.C.'s

13  impairments did not meet or equal the severity of one of the listed impairments in the Listing,

14  specially rejecting Listing 1.04 for disorders of the back.  Id.

15      In assessing R.C.'s residual functional capacity, the ALJ acknowledge that he was to

16  follow a two-step process in which he must first determine whether there is an underlying

17  medically determinable physical or mental impairment that could reasonably be expected to

18  produce R.C.'s pain or other symptoms.  Id. at 16-17.  Then, the ALJ must evaluate the intensity,

19  persistence, and limiting effects of the R.C.'s symptoms to determine the extent to which they

20  limit R.C.'s functioning.  Id.  The ALJ described R.C.'s symptom testimony as follows:

21          The claimant makes the following allegations regarding the
22          intensity, persistence, and limiting effects of his symptoms.  The
            claimant alleges disability due to back and neck injury with
23          difficulty walking and standing; much pain in his back; right knee
            goes numb; pain comes and goes in lower left side, front, and back;
24          and increased pain with sweating.  He testified that he stopped
            working as a mover in 2014 after he had an auto accident in June
25          2014 and his neck pain worsened.  He stated that as a mover, he was
            working about 25 hours per week moving boxes, dishes, clothes,
26          refrigerators, "everything"; lifting and carrying up to 100 pounds.
            He reported that he has arthritis through his neck and back, as well
27          as numbness in his legs and arms.  He testified that his lower back
            hurts and shoots down his right leg ("sciatica") about twice per
28

United States District Court
Northern District of California

week, at which time he is not able to get out of bed.  He reported that he is not longer able to walk very far and cannot walk for more than 15 minutes.  He testified that he does not use a cane or walker. He stated that he has more back and knee pain when he walks, but he is in constant pain.  He testified that he can sit for an hour and a half and then must change positions.  He testified that he can stand for about two hours, but then has to take a break for an hour and a half so that the pain in his legs stops.  He reported that he cannot carry more than 15 pounds.  He testified that he can lift his arms over his head but is very painful.  He testified that pain does down his arms and he can barely hold anything.  He testified that he gets cramps in his fingers.  He testified that he has had physical therapy for the discs in his back, but there has been no talk of surgery.  He testified that it is hard to sleep because of neck pain and he has to take a nap for an hour and a half a day.

The claimant stated that he lives with his sister.  He stated that his daily activities are limited.  He testified that on a typical day, he gets up, takes his dog for a slow walk for about 30 minutes for a block with the dog stopping five or six times, and might go for a drive with his girlfriend.  He stated that he can sit in a car for an hour and a half.  He testified that he uses a stool in the shower because he gets dizzy and does not want to fall.  He testified that he cannot do chores and does not vacuum because of pain, but he makes his bed daily and can do a little dusting.  He testified that he cannot cook or do dishes because he cannot stand too long with moving around, and his sister or girlfriend does it.  He stated that his brother and sister-in-law do the grocery shopping and carry in the groceries.  He testified that he has a diver's licenses, but is girlfriend drives him to doctor appointments.  He stated that he goes to church weekly.

Id. at 17-18.

The ALJ stated that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and do not support the existence of limitations greater than those reported above." Id. at 18.  To support this conclusion, the ALJ summarized R.C.'s medical history.  The ALJ began by noting that R.C. had x-rays of the cervical spine in August 2012 that showed mild to moderate degenerative disc disease with mild degenerative facet changes.  Id.  The ALJ acknowledged that R.C. presented to the emergency room in October 2012 for complaints of lower back pain with onset of one year.  Id.  However, the ALJ noted that "[p]hysical examination was normal with normal range of motion and muscle tone and no neurologic deficient noted."  Id.

1    The ALJ observed that "[a]lthough the claimant asserts onset of disability in June 2013,

2    there is no evidence of any injury or worsening of condition at or around that time.  Moreover,

3    there is not even evidence of treatment sought at that time."  Id.  The ALJ states that R.C. sought

4    no medical treatment until September 2013 and October 2013, which was unrelated to his asserted

5    disabling conditions and R.C. was noted to "specifically deny neck and back pain."  Id.  The ALJ

6    noted that at the time, there were no abnormalities on musculoskeletal or neurological

7    examinations.  Id.  The ALJ noted that R.C. was examined for various unrelated condition

8    between October 2013 to June 2014.  Id.  The ALJ specifically stated that in 2014, R.C. "again

9    denied back or neck pain and was noted to have normal musculoskeletal and neurologic physical

10   exam finding."  Id.

11   The ALJ then discussed R.C.'s July 2014 examinations after R.C. had been involved in an

12   automobile accident.  The ALJ stated R.C. was noted to have "some mild discomfort on range of

13   motion of the neck and bilateral paraspinous tenderness to palpation of the neck and back.  He was

14   noted to have normal gait, intact motor and sensory, and normal coordination and muscle tone.  He

15   was diagnosed with back/neck pain/strain/sprain."  Id.  The ALJ stated that at R.C.'s follow up

16   examination, R.C. "presented with complaints of persistent low back and neck pain since the

17   accident.  He was noted to request three more weeks off."  Id.  The ALJ notes that R.C. had "full

18   range of motion of the musculoskeletal and no costovertebral angle tenderness of the back."  Id.

19   The ALJ further states that R.C. "was assessed as 'mildly symptomatic.'"  Id.

20   The ALJ summarized R.C.'s treatment for the remainder of 2014, noting that R.C. returned

21   to the emergency room in October 2014 for persistent low back and neck pain but was noted to

22   have no costovertebral angle tenderness of the back and negative straight leg examination.  Id. at

23   18-19.  The ALJ noted that in December 2014, the doctor assessed R.C.'s lumbago "to be

24   asymptomatic but cervicalgia was still symptomatic."  Id. at 19.  R.C. was given a work release

25   note and was to continue with his current medications.  Id.

26   The ALJ discussed R.C.'s February 2015 examinations and acknowledged that R.C.

27   reported that "the pain had been slowly progressing over several years."  Id.  The ALJ noted that

28   R.C. had stated that "the pain was always present, variable in intensity, and with some radiation

17

1   down upper arms to just above elbows" but that R.C. "denied any effect on the strength of his

2   hands and no numbness or weakness." Id.  The ALJ stated that in the record, R.C. "was noted to

3   sit stiffly and keep his head still." Id.  Further the ALJ recognized that "[r]ange of motion of the

4   neck was noted to be at 74 percent expected." Id.

5       The ALJ discussed R.C.'s follow up examination later in the month where R.C.

6   complained of "neck pain, occasionally radiating to the left upper extremity with numbness into

7   the left hand fingers" and "left-side sciatica with radiation into the left and persistent right knee

8   pain." Id.  The ALJ notes that R.C. was referred to physical therapy and was to have an MRI of

9   the cervical spine.  The MRI conducted in March showed "moderate right central disc protrusion

10  at C4-5 with narrowing of the subarachnoid place but no cord compression; and moderate left

11  central disc protrusion at C6-7 with moderate left neuroforaminal stenosis." Id.  The ALJ

12  acknowledged that in April 2015, R.C. was diagnosed with osteoarthritis of the neck and referred

13  to physical therapy. Id.  The ALJ briefly notes that R.C. successful met all of his physical therapy

14  goals in five of the six sessions. Id.

15      The ALJ noted that in July 2015, R.C. was provided with a work note but acknowledges

16  that it is not clear what the purpose of the note was. Id.  The ALJ notes that the doctor stated that

17  R.C. "is being evaluated and treated for chronic neck and low back pain with sciatica; and that

18  imaging studies suggest moderate disc disease of the spin[e], but he was 'non-surgical' at that

19  time." Id.

20      The ALJ discussed R.C.'s August 2015 examination and noted that R.C. complained of a

21  stiff, sore neck but "denied any radiation to the arms or hands." Id. at 19.  The ALJ further noted

22  that the records showed that R.C. was "noted to have some decreased range of motion of the neck

23  and tenderness of the right trapezius, but nonfocal neurological exam." Id.  The ALJ decision

24  noted that R.C. continued to receive treatment for his neck and back pain in 2015 and 2016 and

25  R.C. stated that his medications were helping. Id. at 19-20. The ALJ acknowledged that on March

26  9, 2016, R.C. reported that his neck pain is stable. Id. at 20.  The ALJ further noted that R.C. had

27  reported that he had some good days and some not so good during his examination in April 2016.

28  Id.

United States District Court
Northern District of California

18

1

The ALJ discussed R.C.'s September 14, 2016 examination where R.C. requested more

2

pain medication and a stronger agent.  Id. at 20.  The ALJ noted that R.C. "was specially noted to

3

have no bilateral weakness to lower extremities and no bowl/bladder incontinence or retention."

4

Id.  The ALJ further stated that:

5

> [R.C.] was noted to be negative for neck pain and neck stiffness, but

6

> positive for back pain.  He was noted to have normal range of motion
> of his neck.  He was noted to have tenderness to palpation and

7

> spasticity of the lumbar paraspinal musculature, but no swelling,
> costovertebral angel tenderness, or stepoffs.  Straight leg raise was

8

> noted to be normal bilaterally with normal sensation in the L4, L5,
> and S1 dermatomes bilaterally and normal strength and range of

9

> motion in the lower extremities.  It was noted that his back pain was

10

> most likely a musculature flare with low suspicion for cord
> compression given normal neuro exam.

11

Id.  The ALJ stated that x-rays showed no acute compression deformities and no evidence of

12

spondylolysis or spondylolisthesis, but did have degenerative changes in the lower lumbar spine

13

with facet arthropathy.  Id.

14

After consideration of the evidence, the ALJ found that R.C.'s medically determinable

15

impairments could reasonably be expected to cause the alleged symptoms but that R.C.'s

16

statements concerning the intensity, persistence, and limiting effects of these symptoms are not

17

entirely consistent with the medical evidence and other evidence in the record.  Id. at 20.

18

Specially, the ALJ noted that "[e]ven after the lapse of the claimant's date last insured, he was

19

working in capacities that require a high level of exertion, e.g., a mover."  Id.  The ALJ noted that

20

"throughout the claimant's medical record he has shown full strength, a normal gain, and a normal

21

range of motion throughout."  Id.  The ALJ also noted that "[p]hysical therapy for [R.C.'s] neck

22

was noted to be successful and he was even discharged early due to meeting his goals."  Id.  The

23

ALJ also considered the fact that there was no evidence that R.C. followed through with his

24

request for additional physical therapy or the referrals to neurosurgery or rheumatology.  Id.  The

25

ALJ further noted that R.C.'s condition was specially noted to be non-surgical and that there were

26

frequent reports that his prescribed medications for pain were helping.  Id.  The ALJ further found:

27

> The claimant's own admitted activities of daily living are

28

> inconsistent with his asserted level of disabling limitations.  He

19

1

2

3

4

5

> reported that he lives with his sister, whom he relies on to do
> cooking and grocery shopping, but he makes his bed and does some
> dusting, is able to walk his dog for up to 30 minutes per day, can
> ride in a car for up to one and a half hours, and attends church
> services regularly.  Given the claimant's presentation in multiple
> physical exams, his work as a mover throughout much of his
> asserted period of disability, and his activities of daily living, the
> DDS assessed residual functional capacity of Medium exertional
> level work is found compelling.

6

Id. at 20-21.

7       The ALJ discussed Dr. Burns' September 8, 2015 medical source statement regarding

8   R.C.'s limitations but stated that the ALJ gives little to no weight to Dr. Burns' opinion because:

9

10

11

12

13

14

15

> Dr. Burns asserts conditions for which there is no treatment or
> diagnosis (e.g., depression); asserts contradictory information (e.g.,
> that the claimant can walk four city blocks, but maximum work
> capacity throughout the day is two hours standing and two hours
> sitting); there is no treatment or findings consistent with these
> limitations (see Exh. 3F, 4F, 5F, 10F).  Moreover Dr. Burns' opinion
> is directly contrary to his own treatment's notes at Exhibit 10F/20 in
> September 2016, which showed full range of motion and strength in
> the back for negative straight leg raise and full strength in the lower
> extremities despite his report of tenderness in the back and
> continued pain.

16   Id. at 21.  The ALJ instead gave "great weight" to the opinions of the State agency medical

17   consultants because "they are consistent with the record as a whole as described in detail herein,

18   including overall normal physical exam findings throughout the period at issue and inconsistent

19   actives of daily living with asserted disability limitations."  Id.

20       The ALJ found that R.C. was unable to perform any past relevant work.  Id. at 21-22. The

21   ALJ determined that R.C. was an individual closely approaching advance age, on the alleged

22   disability onset date and subsequently changed age categories to advance age.  Id. at 22.  The ALJ

23   found that R.C. had at least a high school education and was able to communicate in English.  Id.

24   The ALJ further found that transferability of job skills was not material to the determination of

25   disability because "using the Medical Vocational Rules as a framework supports a finding that the

26   claimant is 'not disabled.' Whether or not the claimant has transferable job skills."  Id.  The ALJ

27   found that there are jobs that exist that R.C. could perform, namely as an "industrial cleaner",

28   "kitchen helper," or "salvage laborer." Id. at 22-23.  Thus, the ALJ determined that R.C. was not

United States District Court
Northern District of California

1   disable from June 15, 2013 through the date of the ALJ's decision.  Id. at 23.

2          R.C. requested a review of the ALJ's decision, but his request was denied.  Id. at 1-6.

3   Thus, the ALJ's decision became the final decision of the Commissioner.  R.C. subsequently

4   requested judicial review.

5          **F.    Motions for Summary Judgment**

6          In his motion for summary judgment (Pl.'s Mot., dkt. 17), R.C. argues that the ALJ erred

7   in rejecting Dr. Burns' opinion absent clear and convincing reasons.  Id. at 8-10.  In addition, R.C.

8   argues that the ALJ improperly found that R.C.'s statements concerning the intensity, persistence,

9   and limiting effects of these symptoms were not entirely consistent with the medical evidence and

10  other evidence in the record.  Id. at 10.  R.C. argues that the ALJ failed to identify clear and

11  convincing reasons, based on the record, why the limitations R.C. described do not exist.  Id.  at

12  13.  Finally, R.C. argues that the ALJ's step five finding is not supported by substantial evidence.

13  Id. at 13.

14         R.C. argues that he was age 55 as of his date last insured for Title II benefits, which was

15  3/31/14.  The ALJ found R.C. cannot perform any of his past relevant work and the VE testified

16  there would be no transferable skills.  Id. at 59-60.  Given R.C.'s age, his high school education,

17  and his work history, R.C. argues that if he is limited to light work, he would be deemed disabled

18  pursuant to 20 C.F.R. § 404, Subpart P, Appendix 2, Rule 202.06.  R.C. requests this Court reverse

19  the ALJ's decision and remand for award of benefits, or, as a lesser alternative, remand this case

20  for a new hearing and further administrative proceedings.  Id. at 14.

21         The Commissioner argues that based on the record evidence, the ALJ permissibly found

22  Dr. Burns' opinion inconsistent with the bulk of the record evidence and the ALJ permissibly gave

23  more weight to the State agency reviewing consultants' opinions over the opinion of Dr. Burns.

24  Comm'r's Mot., dkt. 20, at 9-10.  The Commissioner also argues that substantial evidence

25  supported the ALJ's evaluation of Plaintiff's subjective allegations of disabling symptoms.  Id. at

26  10.  The Commissioner argues that the ALJ properly found that there was a lack of objective

27  support for R.C.'s allegations, R.C.'s statements of disabling symptoms were inconsistent with

28  evidence that treatment measures effectively improved his condition and symptoms, R.C.'s

complaints were inconsistent with his lack of treatment, R.C.'s allegations of disability were inconsistent with the evidence based on doctor statements and opinions, and R.C.'s testimony of disability was inconsistent with the record evidence. Id. at 11-13. Finally, the Commissioner argues that substantial evidence supported the ALJ's step five finding. Id. at 14. The Commissioner argues that R.C.'s request to remand for payment and essentially credit-as-true Dr. Burns' medical opinion is inappropriate. Id. at 15. The Commissioner requests that the Court grant the Commissioner's motion for summary judgment and deny R.C.'s motion. Id. In the alternative, the Commissioner request that the Court remand the case to the agency for additional investigation or explanation. Id.

In his reply, R.C. argues that the Commissioner's assertion that the ALJ needed to provide only specific and legitimate reasons to discount the opinion of R.C.'s treating doctor because this opinion was "contradicted" by the opinions of the non-examining state agency physicians is improper. Reply, dkt. 21, at 1-2. Instead, R.C. argues that the ALJ needed to prove clear and convincing reasons if he wished to discount Dr. Burns' opinion. Id. at 2. R.C. also argues that neither the ALJ nor the Commissioner has attempted to explain how the objective medical evidence, R.C.'s activities, or R.C.'s limited treatment are inconsistent with the limitations R.C. described in his testimony which establish disability. Id. at 5. Finally, R.C. argues that the ALJ's step five finding is not supported by substantial evidence because the hypothetical questions posed to the vocational expert did not set out all the limitations and restrictions of the particular claimant. Id. at 5.

## III.   ANALYSIS

### A.   Legal Standard

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings. 42 U.S.C. § 405(g); see also 42 U.S.C. § 1383(c)(3).

When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free of legal error and supported by "substantial evidence." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a

conclusion" and that is based on the entire record.  Richardson v. Perales, 402 U.S. 389, 401. (1971).  "'Substantial evidence' means more than a mere scintilla," id., but "less than preponderance."  Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted).  Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence.  Benitez v. Califano, 573 F.2d 653, 655. (9th Cir. 1978) (quoting Flake v. Gardner, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985)).

Although the Court may "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [the ALJ] did not rely," Garrison v. Colvin, 759 F.3d 995, 1010 (9th Cir. 2014), "harmless error analysis applies in the social security context."  Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015).  "[W]here the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency can decide whether reconsideration is necessary.  By contrast, where harmlessness is clear and not a borderline question, remand is not appropriate."  McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011) (footnotes, citations, and internal quotation marks omitted).  If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits.  See Garrison, 759 F.3d at 1019–21.

### B.      Medical Opinion Evidence

#### 1.      Legal Background

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of

an examining physician is entitled to greater weight than that of a non-examining physician." Garrison, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "[T]he opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." Id. at 1202 (quoting Lester, 81 F.3d at 831). The Ninth Circuit has emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Id. This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." Orn v. Astrue, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick [v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)]. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." Id. (citation omitted).
>
> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. See Nguyen v. Chater, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it very little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. See id.

Garrison, 759 F.3d at 1012–13.

### 2.   The Standard that the ALJ Must Meet When Rejecting a Treating Physician's Opinion

As an initial matter, despite the guidance in Garrison, the parties dispute which test the

1    Court should apply in evaluating this claim.  R.C. argues that the ALJ was required to provide

2    clear and convincing reasons for rejecting the opinion of R.C.'s treating physician, Dr. Burns,

3    because "when the opinion of a non-examining doctor is the <u>only</u> opinion which contradicts the

4    treating doctors' opinions, the treating doctors' opinions are considered <u>uncontradicted</u>, because

5    the non-examining doctor's opinion is not substantial evidence."  Reply, dkt. 21, at 1-2 (emphasis

6    in original).  However, the Commissioner argues that the Court need only find that the ALJ

7    provided specific and legitimate reasons for discounting Dr. Burns' opinion.  Comm'r's Mot., dkt.

8    20, at 5-6.

9         The Court agrees with Commissioner that the ALJ needed only provide specific and

10   legitimate reasons supporting his opinion.  The Ninth Circuit applies the "specific and legitimate

11   reason test" in cases in which a non-treating, non-examining physician's opinion conflicts with a

12   treating physician's opinion.  <u>See, e.g.</u>, <u>Cain v. Barnhart</u>, 74 F. App'x 755, 756 (9th Cir. 2003).

13   Furthermore, in some cases, a non-examining medical advisor's testimony may be used, in part, to

14   reject the opinion of an examining or treating physician.  <u>Lester</u>, 81 F.3d at 831.  "Opinions of a

15   non-examining, testifying medical advisor may serve as substantial evidence when they are

16   supported by other evidence in the record and are consistent with it."  <u>Morgan v. Commissioner</u>,

17   169 F.3d 595, 600 (9th Cir. 1999).

18        R.C. cites <u>Winans v. Bowen</u>, for the proposition that a treating physician's opinion can be

19   "uncontradicted evidence" despite the contrary opinions of the non-examining physicians.  853

20   F.2d 643 (9th Cir. 1987).  However, that case does not support R.C.'s position that the clear and

21   convincing reasons standard should apply.  In that case, the Ninth Circuit stated that "[i]f the ALJ

22   wishes to disregard the opinion of the treating physician, he ... must make findings setting forth

23   specific, legitimate reasons for doing so that are based on substantial evidence in the record."

24   <u>Winans v. Bowen</u>, 853 F.2d 643, 647 (9th Cir. 1987) (internal quotation marks and citation

25   omitted).  R.C.'s other cited case, <u>Gallant v. Heckler</u>, is distinguishable because in that case, the

26   non-examining, non-treating physician's opinion was "contradicted by all other evidence in the

27   record."  753 F.2d 1450, 1454 (9th Cir. 1984).

28

United States District Court
Northern District of California

### 3.      Dr. Burns' Opinion Evidence

The ALJ acknowledged that:

> Dr. Burns opined that the claimant could walk four city blocks
> without rest or severe pain; sit, stand, and walk a total only two hours
> each out of an eight-hour workday; and must walk every 60 minutes
> as well as a job that permits shifting positions at will from sitting,
> standing, or walking….Dr. Burns opined that the claimant would be
> able to lift 20 pounds occasionally and 10 pounds frequently and
> would have limitations in moving the head and postural movements.
> Lastly, Dr. Burns opined that the claimant would likely be absent
> about three days per month from work as a result of his impairments
> or treatment.

AR at 21.  As described in more detail above, Dr. Burns opined that R.C. had limitations

including, rarely looking down and occasionally turning his head right or left, looking up, or

holding head in static position.  AR at 544-47.  Dr. Burns opined that these limitations began on

February 24, 2014, which is after the date of alleged onset.  Id. at 547.  The ALJ gave "little to no

weight" to the opinion of R.C.'s treating physician, Dr. Burns.  The ALJ discredited Dr. Burns'

opinion because the ALJ found: (1) Dr. Burns asserted conditions for which there is no treatment

or diagnosis (e.g., depression); (2) Dr. Burns asserted contradictory information (e.g., that the

claimant can walk four city blocks, but maximum work capacity throughout the day is two hours

standing and two hours sitting); and (3) there is no treatment or findings consistent with these

limitations.  Id. at 21.  The ALJ gave "great weight" to the opinions of the State agency medical

consultants.  Id.  The Court finds that the ALJ did not provide specific and legitimate reasons for

discrediting Dr. Burns' opinion.

The ALJ's first reason for discrediting Dr. Burns' medical opinion was that Dr. Burns

asserted conditions for which there is no treatment or diagnosis (e.g., depression).  In Dr. Burns'

September 8, 2015 medical opinion statement, in response to the prompt: "[i]dentify psychological

conditions and/or symptoms affecting your patient's physical condition," Dr. Burns checked boxes

indicating R.C. had depression, loss of interest in activities, decreased energy, and sleep

disturbance.  Id. at 545.  However, R.C.'s medical records do not contain any treatment or

diagnosis for depression.  R.C. argues that Dr. Burns did not opine R.C. had a separate impairment

of depression, but that depression and loss of interest in activities were additional symptoms of

1   R.C.'s physical impairment.  Pl.'s Mot., dkt 17, at 10.  The Commissioner did not address R.C.'s

2   argument in its motion.  R.C. is not alleging disability as a result of depression and, thus, while it

3   may be ambiguous whether Dr. Burns intended to opine that R.C. had depression, the fact that Dr.

4   Burns checked certain boxes in his medical opinion statement is not a legitimate reason to

5   discredit his opinion.

6           The ALJ's second reason for discrediting Dr. Burns was that Dr. Burns asserted

7   contradictory information (e.g., that the claimant can walk four city blocks, but maximum work

8   capacity throughout the day is two hours standing and two hours sitting).  The ALJ never explains

9   how Dr. Burns' assertion is contradictory.  The Commissioner also fails to address how these

10  statements are contradictory.  The ALJ's finding is conclusory and not legitimate.

11          The ALJ's third reason for rejecting Dr. Burns' opinion on R.C.'s limitations was that

12  "there is no treatment or findings consistent with these limitations."  Id.  The ALJ did not provide

13  any specific explanation on why he came to this conclusion.  Furthermore, the ALJ did not

14  specifically indicate for each limitation listed in Dr. Burns' opinion, why the ALJ believed that

15  there is no treatment or findings consistent with that limitation.

16          As discussed above, the ALJ acknowledged that the x-rays of the cervical spine from

17  August 2012 showed mild to moderate degenerative disc changes and mild degenerative facet

18  changes and R.C. complained of lower back pain in October 2012.  Id. at 18, 308, 385.  As the

19  ALJ observed, at the time of Plaintiff's alleged onset date of June 2013, there was no record or

20  evidence of an injury or worsening of condition.  Id. at 18.  However, on September 30, 2013,

21  R.C. may have experienced some neck pain but the medical records are inconsistent as to this

22  claim.  Compare id. at 360, with id. at 361.

23          After R.C. was involved in a car accident in June 2014, and after his date last insured, R.C.

24  was treated numerous times for persistent back and neck pain.  The ALJ acknowledged that on

25  July 8, 2014, that the medical records indicate that R.C. had "some mild discomfort on range of

26  motion of the neck and bilateral paraspinous tenderness to palpation of the neck and back."  Id.

27  When summarizing the medical evidence in the decision, the ALJ did not acknowledge that R.C.

28  was also seen on November 13, 2014, for intermittent headaches and associated tingling down his

United States District Court
Northern District of California

27

1    left arm.  Id. at 371.  The medical records noted that the pain "radiates to the left neck and left

2    shoulder, worse with certain movements."  Id. at 373.

3         When the ALJ discussed R.C.'s February 2015 examinations, the ALJ acknowledged that

4    the record noted that R.C. complained of "some radiation down upper arms" and that R.C. "was

5    noted to sit stiffly and keep his head still."  Id. at 19. Further the ALJ recognized that "[r]ange of

6    motion of the neck was noted to be at 74 percent expected."  Id.  The ALJ did not acknowledge

7    that the doctor also found that R.C.'s neck had increased tone in all directions.  Id. at 415.  The

8    ALJ also did not acknowledge that the doctor ordered an abdomen x-ray that showed "[f]airly

9    prominent degenerative changes involving the spine with spurring and sclerosis."  Id. at 429.

10        The ALJ discussed R.C.'s follow up examination later in the month where R.C.

11   complained of "neck pain, occasionally radiating to the left upper extremity with numbness into

12   the left hand fingers" and "left-side sciatica with radiation into the left and persistent right knee

13   pain."  Id. at 19. The ALJ notes that R.C. was referred to physical therapy and was to have an MRI

14   of the cervical spine.  However, the ALJ did not acknowledge that R.C. was seen again on March

15   4, 2015 for flank and neck pain.  Id. at 419.  The ALJ acknowledged that an MRI performed on

16   March 15, 2015 indicated minimal posterior disc-osteophyte complex a C2-3, moderate right

17   central disc protrusion and narrowing of the subarachnoid space without cord compression at C4-

18   5, and moderate left central disc protrusion and moderate left neural foraminal stenosis at C6-7.

19   Id. at 20, 471.  The ALJ did not acknowledge that on March 25, 2015, R.C. saw a doctor for back

20   and neck pain and complained of left hip pain that radiates into his lateral thigh.  Id. at 437.  Upon

21   physical examination, the doctor noted that R.C.'s back was tender, and he was unable to flex or

22   extend due to pain.  Id. at 438.

23        While the ALJ acknowledged that in April 2015, R.C. was diagnosed with osteoarthritis of

24   the neck and referred to physical therapy, the ALJ did not acknowledge that R.C. told his doctor

25   that he was still having lots of neck pain, low back pain, and bilateral hip pain that was worse

26   when walking.  Id. at 439.  The ALJ also did not discuss the physical therapy evaluation where

27   physical therapist noted, "[m]ild difficulty with overhead reaching and mod difficulty with back

28

United States District Court
Northern District of California

28

1   hand reaching with RUE" and moderate difficulty walking long distances and reaching. [11] Id. at

2   459-460.  R.C. also had much difficulty lifting 20 pounds.  Id.  The physical therapist found

3   functional limitations including "function endurance, position and household activities reaching

4   and lifting."  Id.  Even after the successful completion of his physical therapy, R.C. still reported

5   that he could not do lifting, which brought pain back.  Id. at 469.

6           The ALJ decision does not acknowledge that on May 31, 2015, R.C. complained of leg

7   pain and right hip pain that was worse with weigh bearing.  Id. at 443.  The ALJ discussed R.C.'s

8   August 2015 examination and noted that R.C. complained of a stiff, sore neck but "denied any

9   radiation to the arms or hands."  Id. at 19.  The ALJ further noted that the records showed that

10  R.C. was "noted to have some decreased range of motion of the neck and tenderness of the right

11  trapezius, but nonfocal neurological exam."  Id.

12          The ALJ decision did not acknowledge that on October 21, 2015, when R.C. was treated

13  for neck pain, his doctor noted, "increased tone in upper trapezius muscles, flexion full, extension

14  and B rotation about 50% normal."  Id. at 551.  While the ALJ acknowledged that on March 9,

15  2016, R.C. reported that his neck pain is stable, the decision did not acknowledge on April 27,

16  2016, R.C. again reported that he was still having neck pain and stiffness.  Id. at 561.

17          The ALJ decision acknowledged that R.C.'s lumbar spine x-ray dated September 6, 2016

18  indicated that R.C. had degenerative changes in the lower lumbar spine but there was no acute

19  compression deformities and no evidence of spondylolysis or spondylolisthesis.  Id. at 20.

20          The ALJ does not explain why the findings detailed in his decision as well as the

21  additional evidence on the record would not constitute treatment or findings consistent with the

22  limitations outlined by Dr. Burns.  Arguably, the medical evidence may have been sparse in

23  establishing treatment or findings consistent with the limitations in Dr. Burns' opinion prior to

24  R.C.'s date of last insured of March 31, 2014 for R.C.'s Title II claim because the records only

25  _____

26  [11] This Court recognizes that a physical therapist is not an "acceptable medical source" as defined
    by the Social Security regulations.  See 20 C.F.R. §§ 404.1513(a), 416.913(a); compare with 20
27  C.F.R. §§ 404.1513(d), 416.913(d) (discussing "other sources").  However, an ALJ may not
    discount "other" medical sources without explanation, but less weight may be afforded such
28  medical sources if the ALJ provides "germane" reasons.  See Ghamin v. Colvin, 763 F.3d 1154,
    1161 (9th Cir. 2014); Molina v. Astrue, 674 F.3d 1104, 1114 (9th Cir. 2012).

United States District Court
Northern District of California

1    show one x-ray from August 2012 related to R.C.'s disc changes and one, potentially two, doctor's

2    visits for pain.  However, the ALJ's reasons were not legitimate to reject the limitations assessed

3    by Dr. Burns as of the September 8, 2015 date when Dr. Burns filled out the opinion.

4            The ALJ noted that he found Dr. Burns' opinion from September 2015 is "directly contrary

5    to his own treatment notes . . . in September 2016, which showed full range of motion and strength

6    in the back for negative straight leg raises and full strength in the lower extremities despite his

7    report of tenderness in the back and continued pain." Id. at 21.  The Ninth Circuit has recognized,

8    however, that "[t]he primary function of medical records is to promote communication and

9    recordkeeping for health care personnel—not to provide evidence for disability determinations.

10   [The Ninth Circuit] therefore [does] not require that a medical condition be mentioned in every

11   report to conclude that a physician's opinion is supported by the record." Orn v. Astrue, 495 F.3d

12   625, 634 (9th Cir. 2007).  When "the record contains numerous reports from [the claimant's]

13   health care providers, as well as results from medical tests and laboratory findings, that support the

14   questionnaires completed by [the treating physicians]," it is erroneous to focus on a single day of

15   treatment notes, particularly when the treatment records as a whole support a different conclusion.

16   Id.  For example, although the medical records do show that in September 2016 R.C. had full

17   range of motion, records from other examinations reflect visits where R.C. had limited range of

18   motion.  Id. at 370, 415, 460, 549.  Furthermore, the examination findings the ALJ cites from 2016

19   are not inconsistent with R.C. having neck pain and pain in his lower back related to the arthritis

20   present in the x-ray of his lumbar spine.  The ALJ never explained why a lack of neurological

21   signs, such as a straight leg raise test, would indicate that R.C. did not have the limitations

22   contained in Dr. Burns' opinion.  Specifically, the ALJ does not explain why strength in the back,

23   negative straight leg raises, and full strength in the lower extremities would indicate that R.C. did

24   not have the limitations with regards to lifting, looking down, turning his head right or left,

25   looking up, or holding head in static position, and other postural movements.  Therefore, the ALJ

26   has erred as a matter of law by failing to properly weigh the opinion of R.C.'s treating physician.

27           The Commissioner also cites the state agency consultants' opinions that R.C. could

28   perform medium exertional work, and that consultant Dr. Volterra opined limitations of climbing

United States District Court
Northern District of California

ramps and stairs frequently and ropes, ladders, and scaffolds occasionally; frequent crouching and crawling; and limited overhead reaching bilaterally. Comm'r's Mot. at 9. The ALJ stated that he gives "great weight" to the consultants' opinions "as they are consistent with the record as a whole des described in detail herein, including overall normal physical exam findings throughout the periods at issue and inconsistent activities of daily living with asserted disabling limitations." AR at 21. Under Ninth Circuit precedent, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." Lester v. Chater, 81 F.3d 821, 831 (9th Cir. 1995), as amended (Apr. 9, 1996). When considering the period prior to the last date of insured, March 31, 2014, Dr. Volterra, the non-examining physician, stated, "[e]vidence in the current file for the period AOD to DLI regarding the clmt's physical musculoskeletal allegations support physically non-severe; TP exams report normal/supple neck and normal M/S ROM, normal neuro exam, negative ROS for back pain (9/13 and 2/14)." AR at 86. As discussed above, the evidence in the record does arguably support Dr. Volterra's conclusions. However, for the period after the date of last insured, Dr. Volterra's recommendations appear to be inconsistent, stating, "[r]ecommend…L RFC with occ OH reach for T16…his more recent L hip imaging, and neck pain would limit him to a LRFC" but ultimately recommending medium RFC. Id. at 97-98. Furthermore, because the ALJ has not identified sufficient reasons to discredit Dr. Burns' opinion regarding R.C.'s limitations for the time period after R.C.'s June 2014 automobile accident, the contrary opinions of Drs. Trias and Volterra cannot take precedence.

In sum, the ALJ erred in discounting Dr. Burns' opinion generally, although the ALJ may have not necessarily erred in discounting Dr. Burns' opinion regarding the time period prior to the date of last insured.

### C.    R.C.'s Testimony

#### 1.    Legal Standard

Although the ALJ is responsible for evaluating credibility, the Ninth Circuit has formulated a two-step test for considering a claimant's testimony regarding the severity of subjective symptoms:

1

2

3

4

5

6

7

8

9

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation marks omitted). The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996). "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Id.; see also Reddick [v. Chater, 157 F.3d 715, 722 (9th Cir. 1998)] ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").

10

11

12

13

14

15

> Second, if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Smolen, 80 F.3d at 1281; see also Robbins [v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006)] ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.").

16  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).[12]

17       The ALJ found that R.C.'s "medically determinable impairments could reasonably be

18  expected to cause the alleged symptoms; however, the claimant's statements concerning the

19  intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the

20  medical and other evidence in the record."  AR at 20.  The ALJ did not make a finding of

21  malingering.  The ALJ was therefore required to "offer[] specific, clear and convincing reasons" to

22  reject R.C.'s testimony regarding the severity of his symptoms.  Smolen v. Chater, 80 F.3d 1273,

23  1281 (9th Cir. 1996).  "General findings are insufficient."  Reddick v. Chater, 157 F.3d 715, 722

24  (9th Cir.1998) (internal quotation marks omitted).

25

26

27

28

---

[12] The Commissioner here states an objection for the record to the Ninth Circuit's "clear and convincing" standard, but recognizes that this Court is bound by Ninth Circuit authority. Comm'r's Mot. at 10 n.4.

United States District Court
Northern District of California

### 1.    R.C.'s testimony

First, The ALJ states that "the objective findings in this case fail to provide strong support of claimant's allegations of disabling symptoms and do not support the existence of limitations greater than those reported above."  AR at 18.  In presenting this boilerplate justification for rejecting R.C.'s testimony, the ALJ disregarded the rule that "the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence."  Reddick, 157 F.3d at 722; see also Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) ("In this case, the ALJ disbelieved Light because no objective medical evidence supported Light's testimony regarding the severity of subjective symptoms from which he suffers, particularly pain. An ALJ may not discredit a claimant's subjective testimony on that basis."); 20 C.F.R. § 404.1529(c)(2) (providing that the Commissioner will "not reject [a claimant's] statements about the intensity and persistence of . . . pain or other symptoms or about the effect [those] symptoms have on [the claimant's] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements.").

Later in his decision, after summarizing the medical evidence, the ALJ noted "throughout the claimant's medical record he has shown full strength, a normal gait, and normal range of motion throughout . . . through to September 2016."  AR at 20.  First, as described above, the medical record shows that R.C. had difficulty lifting after the automobile accident in June 2014. See id. at 459-460, 469.  Further, the medical record does not consistently show normal range of motion after the automobile accident in June 2014.  Rather, there are instances where R.C. presented with decreased range of motion and discomfort.  See id. at 370, 415, 460, 549.  Further, to the extent R.C. did present with full strength, a normal gait, and normal range of motion, these are merely examples of areas where R.C.'s testimony as to the extent of her subjective symptoms exceeded what could be determined by objective evidence alone.  Having determined that R.C.'s symptoms could reasonably be caused by her impairments, the ALJ was not free to reject testimony as to the severity of those symptoms only on the basis that such severity was not supported by objective evidence.  See Lingenfelter, 504 F.3d at 1036; Reddick, 157 F.3d at 722; Light, 119 F.3d at 792.  Moreover, the ALJ did not explain why full strength, a normal gait, and

1    normal range of motion is incompatible with significant neck and back pain and the alleged

2    resulting limitations especially as to R.C.'s limitations regarding lifting, looking down, turning his

3    head right or left, looking up, or holding his head in static position.

4         The second reason that the ALJ gives in discounting R.C.'s testimony is that "[e]ven after

5    the lapse of the claimant's date last insured, he was working in capacities that require a high level

6    of exertion, e.g., a mover . . . The claimant stated that he worked as a mover through at least June

7    2014 and that he had to stop due to injuries suffered in an auto accident." Id. R.C. stated that

8    from April to June 2014 he worked as a part-time household mover for approximately 25 hours a

9    week. Id. at 35, 37. R.C. testified that while he was working as a mover, the items he was

10   carrying were "[v]ery heavy" and sometimes "about 100 pounds." Id. at 37. The ALJ was entitled

11   to find Plaintiff's testimony of disability inconsistent with the record evidence, where Plaintiff

12   engaged in work activity after his alleged onset date, of performing heavy work as a mover until

13   June 2014, after a car accident, AR at 20, 20, 35-36, 39-40, 58. See 20 C.F.R. § 404.1529(c)(3)(i)

14   (when evaluating information about claimant's symptoms, ALJ may consider a claimant's daily

15   activities); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002) (when evaluating Plaintiff's

16   statements, ALJ may consider "inconsistencies either in [claimant's] testimony or between [his]

17   testimony and [his] conduct," as well as her daily activities). R.C. does not address this reason in

18   his motion for summary judgment or his reply. This reason is clear and convincing as to discredit

19   R.C.'s claim of disability prior to June 2014 but after June 2014, there is no evidence of any

20   further employment.

21        The third reason that the ALJ gives in discrediting R.C.'s testimony is that physical

22   therapy was noted to be successful and there is no evidence that R.C. ever followed through with

23   the additionally requested physical therapy, nor did he follow through with the referrals to

24   neurosurgery or rheumatology. AR at 20. The ALJ noted that R.C.'s condition was non-surgical.

25   Id. In addition, the ALJ noted that there were frequent reports that his prescribed medications for

26   pain were helping. Id. While physical therapy was successful and R.C. was discharge early, at his

27   last session, R.C. still complained of pain whenever he did lifting. Id. at 469. Furthermore, one

28   month after completing physical therapy, on August 19, 2015, R.C. was again seen for neck pain

United States District Court
Northern District of California

after washing his car and Dr. Burns noted that R.C. had decreased range of motion in his neck.  Id. at 549.  Dr. Burns further noted that R.C.'s neck was "[f]ocally tender over R upper trap with trigger point present and increase overall tone."  Id.  While there is no evidence that R.C. followed through with getting additional physical therapy or with a rheumatology specialist, R.C. continued to receive treatment regularly from his doctor for his neck and back pain throughout 2015 and 2016.  Furthermore, while the ALJ states that there are reports that R.C.'s medications were helping, numerous reports on the record show that the R.C. felt that the medications were only helping a little or were not in fact helping.  See id. at 417, 419, 437, 439, 443.  In the latest medical record, R.C. requested his doctor prescribe a "stronger agent" for his pain.  Id. at 566.  R.C. never claimed that medication fully alleviates his pain, and the ALJ never asked R.C. about his medications at the hearing.

Finally, the ALJ found that R.C.'s own admitted activities of daily living are inconsistent with his assert level of disabling limitations because R.C. makes his bed and does some dusting, is able to walk his dog for up to 30 minutes a day, can ride in a car for up to one and a half hours, and attends church services regularly.  Id. at 20.  The testimony cited by the ALJ is not inconsistent with R.C.'s testimony that in general, he cannot stand or walk for more than about 2 hours or sit for more than about 90 minutes in an 8-hour day.  None of the activities the ALJ listed demonstrate an ability to sustain medium exertional level work.

While the ALJ may have provided clear and convincing reasons to discredit R.C.'s testimony regarding his limitations prior to June 2014, the ALJ did not provide clear and convincing reasons to discredit Plaintiff's testimony as his limitations for the time period after R.C. stopped working in 2014.

**D.    The ALJ's Step Five Finding**

Finally, R.C. argues that the ALJ's determination that he could perform medium work was legal error because the ALJ's hypotheticals were defective. In Embrey v. Bowen, 849 F.2d 418, 423 (9th Cir. 1988), the Ninth Circuit stated that hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant. If the vocational expert's hypothetical assumptions are incomplete or lack support in the record, the opinion based

United States District Court
Northern District of California

United States District Court
Northern District of California

1    thereon has no evidentiary value.

2            Here, the ALJ never distinguished between R.C.'s Title II claim, which required R.C. to

3    establish disability prior to March 31, 2014, and R.C.'s Title XVI claim, required R.C. to be

4    disabled and meet certain income thresholds.  When posing his hypothetical questions to the

5    vocational expert, the ALJ never posed a hypothetical setting out all the limitations and

6    restrictions of R.C. prior to March 31, 2014 and another one setting out all of R.C.'s limitations

7    and restrictions as of the hearing date.  However, the ALJ omitted the limitations assessed by

8    R.C.'s treating doctor and discounted R.C.'s testimony, in part, because of a perceived lack of

9    treatment and findings prior to the car accident that occurred in June 2014 and because of R.C.'s

10   work as a mover up until June 2014.  While the ALJ may have properly discredited Dr. Burns'

11   opinion and R.C.'s testimony regarding R.C.'s limitations prior to R.C.'s date of last insured, as

12   discussed above, the ALJ improperly discredited Dr. Burns opinion and R.C.'s testimony

13   regarding his current limitations.

14           Dr. Burns opined that R.C. could walk four blocks without rest or severe pain, could sit for

15   two hours at one time, and could stand for two hours at one time.  AR at 545.  Dr. Burns indicated

16   that R.C. would be able to sit a total of two hours in an 8-hour workday, stand a total of two hours,

17   and walk a total of two hours.  Id.  Dr. Burns also opined that R.C. would need periods of walking

18   around during an 8-hour workday and would need to walk for 10 minutes every hour.  Id.  Dr.

19   Burns opined that R.C. would need a job that permits shifting positions at will because of pain.  Id.

20   at 546.  Dr. Burns believed R.C. could lift 10 pounds frequently, 20 pounds occasionally, and 50

21   pounds rarely.  Id.  Dr. Burns believed R.C. could rarely look down and occasionally turn head

22   right or left, look up, or hold head in static position.  Id.  Dr. Burns opined that R.C. could

23   occasionally twist, rarely stoop, crouch/squat, or climb stairs, and never climb ladders.  Id. at 547.

24   Dr. Burns opined that R.C. would likely be absent from work about three days per month.  Id.

25           The ALJ's hypothetical, however, did not mention many of these limitations.  See id. at 59,

26   543-547.  While the ALJ "need not include all claimed impairments in his hypotheticals, he must

27   make specific findings explaining his rationale for disbelieving any of the claimant's subjective

28   complaints not included in the hypothetical."  Light v. Soc. Sec. Admin., 119 F.3d 789, 793 (9th

36

United States District Court
Northern District of California

Cir. 1997).  The ALJ did not address the limitations contained within Dr. Burns' opinion in depth and gave no reasons for rejecting Dr. Burn's opinion beyond the general reasons discussed above. The ALJ did not make a specific finding explaining his rationale for not including R.C.'s limitations with respect to sustained flexion of neck limitations in his hypotheticals.  The ALJ therefore erred in failing to include R.C.'s limitations in his hypotheticals to the vocational expert.

Ninth Circuit precedent dictates that this error is not harmless:

> [A]n ALJ is not free to disregard properly supported limitations . . . . Such a failure [to include a claimant's validly determined limitations] cannot be deemed harmless because, if the ignored testimony is credited, a proper hypothetical would have included limitations which, the record suggests, would have been determinative as to the vocational expert's recommendation to the ALJ.

Robbins v. Soc. Sec. Admin., 466 F.3d 880, 886 (9th Cir. 2006).  Here, the Court knows what the vocational expert's response would have been to a hypothetical including all R.C.'s limitations because R.C.'s attorney posed one.  Id. at 60–61 (presenting additional hypotheticals, including one corresponding to Dr. Burns' assessment of R.C.'s limitations).  The vocational expert's response was that R.C.'s limitations as outlined would "eliminate most of the medium jobs that are unskilled."  Id. at 61. Based on that response, the Court concludes that the ALJ's error in relying on an incomplete hypothetical RFC was not harmless.  See Robbins, 466 F.3d at 886.

### E. Remand for Further Proceedings

The Ninth Circuit follows the "credit as true" rule, a three-part test that allows the Court to remand to the ALJ to calculate and award benefits when: (1) "the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no] outstanding issues that must be resolved before a disability determination can be made" and "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a whole, there is no doubt as to disability."  Leon v. Berryhill, 880 F.3d 1041, 1045 (9th Cir. 2017) (citations and internal quotation marks omitted); see also Garrison, 759 F.3d at 1021 (holding that a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate case).  The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social

1    Security Act," <u>Garrison</u>, 759 F.3d at 1021, when "there is a need to resolve conflicts and

2    ambiguities," <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1101 (9th Cir. 2014), or

3    when there is ambiguity about when the claimant's disability began that is not solved by the

4    record credited as true. <u>See</u> <u>Dominquez v. Colvin</u>, 808 F.3d 403, 409 (9th Cir. 2015).

5          Here, as discussed above, the ALJ failed to provide legally sufficient reasons for rejecting

6    Dr. Burns' opinion and R.C.'s testimony.  However, there are outstanding issues that must be

7    resolved through further administrative proceedings and the record raises serious doubt as to

8    whether R.C. is truly disabled prior to date of last insured and even after his automobile accident.

9    As discussed above, the only evidence of R.C.'s back and neck pain prior to the accident is an x-

10   ray from August 2012 suggesting mild to moderate degenerative disc disease with mild

11   degenerative facet changes and one, potentially two, doctor's visits where R.C. complained of

12   pain.  At the time of the alleged onset, there is no evidence of any injury or worsening of

13   condition.  Furthermore, R.C. testified that he worked as a mover carrying items "about 100

14   pounds" up until the automobile accident in June 2014.  R.C. testified that his condition worsened

15   after the accident.  The record is not fully developed regarding what R.C.'s limitations were on

16   March 31, 2014, R.C.'s date of last insured, and when R.C. began experiencing the limitations that

17   allegedly prevent him from returning to work.  Thus, the Court cannot hold that the ALJ would be

18   required to find R.C. disabled on remand.  Accordingly, the Court will remand this case for further

19   administrative proceedings consistent with this order.

20   **IV.    CONCLUSION**

21          For the reasons discussed above, R.C.'s motion is GRANTED, the Commissioner's motion

22   is DENIED, and the case is REMANDED for further administrative proceedings consistent with

23   this decision. The Clerk is instructed to enter judgment in favor of R.C. and to close the file.

24          **IT IS SO ORDERED.**

25   Dated: April 23, 2020

26

27   _____

28   JOSEPH C. SPERO
     United States Magistrate Judge

United States District Court
Northern District of California